## WILKERSON *v.* THE STATE.

If a husband, knowing of his wife's criminal infidelity, deliberately lays a trap for her paramour by pretending to him and her that he, the husband, is going on a journey, when it is his purpose not to go but to conceal himself and lie in wait at or near his home for the purpose of killing the paramour in case he should be caught in the guilty act, at the same time expecting and designing so to catch him, the paramour has a right to defend himself against a deadly assault made by the husband under such circumstances, though the assault be made whilst the guilty act is in progress, and if the husband be killed as matter of necessity to prevent his assault from resulting in death, the homicide is justifiable.

2. Under section 3797 of the code which declares that from public policy communications between husband and wife are excluded as evidence, a letter written by the husband to the wife and received by her, which indicates the state of his feelings toward a third person and toward herself in relation to that person, is not admissible in evidence in behalf of such third person on his trial for the homicide of the husband, although the wife voluntarily parted with the possession of the letter by turning it over to the accused before the homicide and the latter has had possession and control of it ever since.

3. In a trial for murder, dying declarations are admissible to prove any relevant fact embraced in the *res gestæ* of the killing.

July 26, 1893.

Before Judge HENRY. Floyd superior court. March term, 1893.

Wilkerson was indicted for murder, and was found guilty of voluntary manslaughter. His motion for a new trial was overruled, and he excepted. For the other facts see the decision.

J. BRANHAM and REECE & DENNY, for plaintiff in error.

W. J. NUNNALLY, solicitor-general, and J. W. HARRIS, Jr., contra.

LUMPKIN, Justice.

1. The tragedy disclosed by the record in this case is, in every way, deplorable. It presents a singularly striking instance of human death and misery resulting from human misconduct. The trial of such a case imposes upon the parties concerned on both sides, the witnesses, the jurors, the counsel and the courts, the performance of the most painful duties. We deeply regret the necessity which requires us to deal with questions of the kind now before us; but we shall not shrink from plainly laying down the law as we understand it to be after anxious and careful examination. The evidence is exceedingly voluminous, and in many respects conflicting. It tends to show, almost beyond the possibility of question, that for many months before the homicide of Stephens, adulterous relations had existed between his wife and his slayer. It also tends strongly to show that this was certainly known to Stephens, and that if he did not actually connive at it, he at least tolerated it. According to the statement made by the accused, the deceased knew of the illicit intercourse, and practically assented to it. There is undisputed sworn testimony showing that Stephens had in his possession, for months before he was killed, a letter his wife had written the accused, and which he (Stephens) had taken from the trunk of the latter; and that for nearly a month before the killing, Stephens also had in his possession a letter which the accused had written to Mrs. Stephens, and which Stephens intercepted before its delivery to her. These letters were in his pocket, and were taken from it after he was fatally shot. Their contents show, almost indubitably, that the writers had been sustaining towards each other the most affectionate, intimate and

guilty relations. Besides, there was much testimony as to numerous incidents and circumstances which, if true, would conclusively establish that Stephens, for a considerable time before the homicide, absolutely knew his wife and Wilkerson had been constantly and repeatedly committing adultery with each other; that in the face of this knowledge he persisted in requesting Wilkerson to remain in his employment when the latter wished to go away and frequently expressed a purpose to do so; and that Stephens, under these circumstances, allowed Wilkerson free access to his house and family, permitted him to take his meals there as a boarder, and maintained towards him a kind and friendly demeanor.

As the case must be tried again, we do not wish to be understood as stating as an undisputed fact that Stephens did know, for sometime before he was killed, of his wife's adultery with Wilkerson. On the contrary, the State strenuously contended that he did not, that he merely suspected her guilt, and that he laid a trap to verify the correctness of his suspicions, and finding them well founded, shot and undertook to kill the adulterer as soon as the discovery was made. We have, therefore, with great brevity, simply undertaken to set forth enough to show that there was strong evidence to support the contention of the defence that the deceased knew, with certainty, of his wife's infidelity to him and of her adultery with Wilkerson, and that he laid the trap, not for the purpose of proving the correctness of mere suspicions, but for the deliberate purpose of catching and surprising his wife and her paramour in an act of which he already knew they had been repeatedly guilty, and then killing the paramour, not to prevent the adultery but to obtain revenge upon the adulterer. The contentions of the State and the accused were as above stated. What the real truth is we do not decide, but we leave open for determination by the jury, at the next hearing, the vitally important issue thus made.

The motion for a new trial contained a large number of grounds. Error was assigned upon numerous charges, and the refusal of numerous requests to charge. It is not necessary to state or discuss them in detail. The law of the case upon the controlling question involved is stated in the first head-note. The evidence is conflicting as to the attitude of Mrs. Stephens and Wilkerson toward each other at the moment Stephens appeared on the scene and began to fire. The State contends that they were in the very act of adultery, and the accused contends their conduct on that occasion was free from all guilt, both in act and intention. Taking the entire charge of the court, in connection with the refusals to charge, it will appear that the trial judge was of the opinion that if Stephens came suddenly upon his wife and Wilkerson, and found them in the act of adultery, or under circumstances indicating that the adulterous act was just over or about to begin, he would be perfectly justifiable in killing Wilkerson on the spot, although he, Stephens, with actual knowledge of their previous guilt, had laid a plan to bring them together for the express purpose of killing Wilkerson. The jury were instructed to this effect, and were nowhere instructed that if Stephens knew of his wife's infidelity, and laid a trap to catch Wilkerson in the act of adultery with her, *expecting and designing to so catch him,* and intending then and there to kill him, he, Stephens, would not be justified in so doing. We think the accused was entitled to a charge of the kind just indicated, with the additional statement that if Stephens was not justified in shooting Wilkerson, the latter had a right to defend himself from a deadly attack by Stephens; and in our judgment a new trial should be granted because such a charge was not given.

*Drysdale* v. *The State,* 83 *Ga.* 744, does not in the least conflict with this view. In that case it was held, that

" a husband may attack for intimacy with his wife in
his presence, raising a well founded belief that the crimi-
nal act is just over or about to begin; and the adul-
terer, though in danger, has no right to defend him-
self by using a deadly weapon," for the reason, as stated
by Chief Justice BLECKLEY, that " whatsoever the law
would justify the husband in doing under such circum-
stances, it would not justify the adulterer in preventing
by homicide or attempting homicide; perhaps not other-
wise than by making his escape." But it does not ap-
pear in the report of *Drysdale's* case that there had been
any previous adultery between him and the wife of the
prosecutor, much less that the latter had any knowledge,
or even a suspicion, of such a thing; and the case was
ruled on the fact therein stated, which merely showed
that the prosecutor caught his wife and Drysdale under
circumstances strongly indicating that they had just
committed, or were about to commit, adultery, and im-
mediately assaulted Drysdale, who replied by shooting
at the husband, and his act was, under the circumstances,
rightly held not to be justifiable.

The strongest case, perhaps, in our reports, asserting
the right of a husband to slay the seducer of his wife, is
that of *Biggs* v. *The State*, 29 *Ga.* 723, and it falls very
far short of sustaining the doctrine that a husband who
knows for weeks of his wife's guilt, and does nothing
to put a stop to it, may then form a deliberate plan to
catch her in the guilty act for the purpose of slaying
her paramour. Such a slaying would be murder, and
nothing else. Judge HOLT had charged the jury that
under no circumstances would a man be justifiable in
taking the life of another who attempts the seduction
of his wife. This charge was too strong, and Judge
LUMPKIN said, in effect, it was the privilege of the jury
to determine whether the strong arm of the husband
may not interfere to shield and defend the wife from

pollution, but he did not say that a husband could justifiably kill the seducer of his wife as a matter of personal revenge.

The law permits and will justify the homicide of another by the husband to prevent the seduction of the wife, or even to prevent the committing with her of a single act of adultery, if by his previous conduct he has not forfeited the right. Nay more, the law will sometimes excuse the husband for slaying the seducer of his wife, immediately after the guilty act is over, if he acts promptly and in that burst of passionate indignation which overwhelms him upon discovering the outrage which has been done him. Even where a husband suspects the fidelity of his wife, he may watch, and may seek and make opportunities to test the correctness of his suspicions; and upon finding that they are true, he may, upon catching the adulterer in the criminal act, or under circumstances showing it has just taken place or is about to begin, justifiably slay the adulterer. But the law has never in any civilized country justified, nor, in our opinion, ever will justify, the killing by a husband of an adulterer of whose guilt he had long known, and towards whom he had manifested a friendly feeling; certainly not when, in addition to these facts, it also appears that the adulterer was aware of the husband's knowledge of his guilt.

It is conceivable that one man may invite another to share his marriage bed; and where this is done, it could not for a moment be contended that if the husband surprised the other in an act of adultery with his wife, he would be justifiable in slaying the adulterer. Where a husband connives at, and tacitly consents to adulterous relations between his wife and another man, and such connivance and consent are known to the latter, it is somewhat in the nature of an invitation to debauch the wife, the difference between such conduct and a positive

invitation being in degree only. While, of course, the behavior of the adulterer is heinous and unlawful, and cannot be justified or excused, the husband cannot, under such circumstances, become his legal executioner and put him to death. The simple truth is, that while the law may justify a homicide committed for the purpose of preventing adultery, and may excuse a homicide on the part of one who promptly resents unto death an unauthorized and totally indefensible invasion of his marital rights, the law never makes justifiable a homicide committed in a spirit of revenge, and for the purpose of revenge only.

The rule we lay down in the present case is no new doctrine in Georgia. In *Hill* v. *The State*, 64 *Ga.* 469, JACKSON, Justice, said, "our law broadly separates the act of deliberately seeking another and slaying him for past wrongs, however heinous they may be, from the act of slaying another to prevent his doing a present wrong, or future wrong imminently impending. Whenever done to avenge the past, it is not justifiable; when done under pressing necessity to defend life, or limb, or wife, or child, or habitation, or property, against felonious attack on either, it is justifiable." And in that case it was held that in order to justify the killing, it must have been done to prevent the deceased from attempting or consummating the impending adultery with the wife, and not to avenge a past adultery with her. Again, in *Cloud* v. *The State*, 81 *Ga.* 450, BLANDFORD, Justice, said: "We do not think that any man is justifiable in killing another who has committed adultery with his wife, after the adultery has been committed; for that would seem to be killing in a spirit of revenge, which would make it murder. The killing must be done to prevent the adultery, and there must be a necessity for it. The taking of human life must be necessary to prevent this great wrong upon the peace and happi-

ness of families, in order to justify the homicide. The law is, that the killing must be to prevent the adultery, and it is only in such case that the killing would be justified." It follows, from the rule laid down in these cases, that where a husband knows his wife has repeatedly committed adultery with another man, and lays a trap by which he may detect them in the commission of yet another adulterous act, his purpose being to avenge the past adultery, and not, of course, to prevent the particular act of adultery which he expects to witness, he could not be justifiable in slaying the adulterer. See, also, *Mays* v. *The State*, 88 *Ga.* 399, and the authorities there cited. An examination of those authorities will show that, at common law, it was manslaughter for a husband to kill an adulterer even when caught in the very act of illicit intercourse with the slayer's wife; and it is only by virtue of section 4334 of our code, which follows the sections defining justifiable homicide, and declares that " all other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide," that the killing of an adulterer by the husband is ever rendered completely justifiable. But for this section, the common law rule would now be of force in this State.

If the theory of the defence be true, viz: that Stephens was attempting to kill Wilkerson for the purpose of avenging past wrongs of which Stephens had full knowledge, then Stephens was certainly endeavoring by violence and surprise to commit upon Wilkerson a crime amounting to at least voluntary manslaughter, which, under our law, is a felony; and this being true, Wilkerson had the undoubted right, under the plain letter of section 4330 of the code, to defend himself even to the extent, if necessary, of taking his assailant's life. We repeat again, out of abundant caution, that we do not wish to be understood as deciding that this theory of

the defence is the truth of the case.   It will be the duty of the jury to pass upon this question under proper instructions from the court, and we have no wish to interfere in the slightest manner with their solution of it. We hold further, that if Stephens did not actually know of his wife's guilt, but only suspected it, and laid a trap for ascertaining in good faith whether or not his suspicion was well founded, and if by reason of having laid the trap he caught his wife and Wilkerson in the act of adultery, or under circumstances showing they had just committed or were about to commit this crime, he had a perfect right under the spirit of our law to kill the adulterer, and under such circumstances Wilkerson would have had no right to defend himself by making a deadly attack upon the person of Stephens.   The case will turn upon the proper determination of this question by the jury.   We order a new trial simply because the law covering both phases of this most lamentable occurrence has not been fully and fairly presented to the jury. This court will go as far as the rules of established law will permit in protecting the virtue and chastity of the wives and daughters of this State from the criminal wiles of the adulterer and seducer, and will uphold husbands and fathers in all they may lawfully do to maintain and protect the sanctity of their homes and firesides. But it must be remembered that no husband or father, with a full knowledge that wrongs of this kind have been perpetrated in his household, can quietly acquiesce in or submit to the same, and then deliberately lay schemes for the purpose of inflicting mortal punishment upon the wrong-doer.   The law rightly attributes such conduct to motives of revenge, which it has never tolerated.

2. On the trial, the accused offered in evidence, and also offered to read as a part of his statement, a letter which had been written by Stephens to his wife, and

v 91-47

which she had voluntarily delivered to Wilkerson some time before the homicide. This letter contained intimations that the writer knew of the relations existing between his wife and Wilkerson, and also a threat against the latter. The court rightly rejected the letter, and refused to allow it to be read to the jury. Section 3797 of the code declares that communications between husband and wife are, from public policy, excluded as evidence. Mrs. Stephens would not, for this reason, have been permitted, as a witness upon the stand, to testify to communications from her husband to herself, or to read to the jury a letter which he had written to her. We are therefore decidedly of the opinion that the same result cannot be indirectly accomplished by her voluntarily delivering a letter of this kind to another person. We are aware that there are respectable authorities holding that a privileged oral communication may be given in evidence by one who overheard it, though an eavesdropper; or that a privileged written communication, purloined from the proper custodian of it, may be received in evidence. In such instances, however, the parties to the privileged communication do not themselves successfully make and keep it private; but where this result is accomplished, the law will not permit either of the parties, directly or indirectly, to violate the confidence of the other. In respect to documents, there is a difference between those which are confidential in their own nature, such as letters between husband and wife, and those which become confidential by custody, such as papers deposited by a client with his attorney. The law, for reasons of its own, desires that all communications between husband and wife shall be absolutely free and untrammeled, and that each may say or write whatsoever he or she pleases to the other, with the absolute assurance that the one receiving the communication will neither be compelled nor permitted to disclose it. We

therefore think it the wiser and better course to adhere strictly to the declared policy of our law, and to hold that this letter was properly rejected, however important it may be in the determination of this case.

3. The State introduced in evidence dying declarations of the deceased, to the effect that he caught his wife and Wilkerson in the act of adultery. In charging upon the law of dying declarations, the court, among other things, stated to the jury that if the declaration made by the deceased "alleges or sets up any fact tending to show adultery between the defendant and deceased's wife at the time of the killing, then I charge you that if the killing immediately grew out of that, one way or the other, you may consider this declaration, if you find it was satisfactorily proven. I say, under the rules I have given you, if it was a dying declaration, consider it in reference to that fact, whether anything of that kind was going on as I have indicated." The objection to the charge was, that such a declaration could not be received to prove adultery in such a case. Section 3781 of the code declares that dying declarations made by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, are admissible in evidence in a prosecution for the homicide. In our opinion, the words "as to the cause of his death" are sufficiently broad to include all relevant facts embraced in the *res gestæ* of the homicide. The object of the law in permitting such declarations to be received would be defeated if they were confined to the immediate physical cause of the death, and the name of the slayer. The conversation or conduct of the parties at and immediately preceding the homicide, and constituting the *res gestæ* of the occurrence, such as a witness would be permitted to relate, may, we think, be proved by the dying declarations of the person killed. These declarations are received without the sanction of

an oath, because the law presumes that, in view of the solemnity of approaching death, of which the party is aware, he will speak the truth; and this being so, no reason occurs to us for excluding such declarations as proof of any fact transpiring at the time of the homicide, which will throw light upon the conduct of the parties on that occasion.          *Judgment reversed.*