## 2496.  ROSSI *v.* THE STATE.

1. "The question of what is sufficient to reduce the grade of the crime where a killing is prompted by passion is one thing, and the question of what is sufficient to excite the fears of a reasonable man that a felony is about to be committed upon him is another and very different thing." Consequently, in a case where it is insisted that the homicide was committed by the defendant under the fears of a reasonable man, upon whom a serious bodily injury or felony was about to be perpetrated, it is error to charge the jury that "provocation by words, threats, menaces, or contemptuous gestures will in no case free the person killing from the guilt and crime of murder," without calling the attention of the jury to the fact that while words, threats, or menaces will ·not mitigate the offense, and while even the heat of passion, supposed to be irresistible, presents no excuse for homicide, nevertheless, words, threats, or menaces, may justify a killing if the circumstances be such as reasonably to arouse the fears of a reasonable man that a felony is about to be committed upon him.

2. "If a man takes the life of another who attempts the seduction of his wife, under circumstances of direct and gross aggravation, it is for the jury to find whether the case stands upon the same footing of ·reason and justice as other instances of justifiable homicide enumerated in the Penal Code."

3. One who may rightfully eject another from his house has the right to use whatever force is necessary to accomplish that purpose. If request, persuasion, and remonstrance have proven ·fruitless, and the right to the possession of one's home and the protection of his family require the eviction of an intruder, the degree of force which may be employed is limited only by the necessity for its use. Even life itself may be taken if a lesser degree of force is unavailing.

Conviction of manslaughter; from Floyd superior court— Judge Maddox. February 19, 1910.

Argued March 22,—Decided May 12, 1910.

*M. B. Eubanks, Ennis & Shaw,* for plaintiff in error.

*John W. Bale, solicitor-general,* contra.

RUSSELL, J. The defendant was indicted for the offense of murder and was found guilty of voluntary manslaughter. He excepts to the judgment overruling his motion for new trial. The motion for new trial contains a large number of grounds. It is not necessary to state or discuss them in detail. In the main the

charge of the learned trial judge is a lucid and impartial exposition of the law. We think, however, that the plaintiff in error is entitled to a new trial upon three of the exceptions presented.

1. In the first place the judge charged that portion of §65 of the Penal Code which relates to provocation by words, threats, menaces, etc., without such explanation as was required in a case like this, where the defendant presented the defense that his action was prompted by the fears of a reasonable man that the shooting was necessary for the protection of his life. If the defense had been only that the defendant was defending against an actual assault, the section might have been charged as it was by the trial judge, without qualification. Words, threats, menaces, and contemptuous gestures of themselves will not reduce a killing from murder to voluntary manslaughter. But, as held in the *Cumming* case, 99 *Ga.* 662 (27 S. E. 177), words, threats, or menaces, according as either may be accompanied by other circumstances, may generate a reasonable fear, on the part of one to whom they are directed, that he is in danger of such serious bodily harm as may amount to a felony. And in such a case, if the jury come to the conclusion that the reasonable fears actually existed, although they were generated by threats or gestures, the jury would be authorized to justify the killing and acquit the defendant. In the present case, while the State introduced testimony to the effect that the killing was unprovoked, testimony was adduced in behalf of the defendant which tended to show that the deceased was a large and powerful man, far superior physically to the defendant, and that the threat said to have been made by him was accompanied by a manifest attempt to carry the threat into execution. If the jury believed this testimony they should have been instructed that it was for them to determine what threat and menace, if any was proved, would justify the defendant in assuming that his life was then in danger; and even if as a matter of fact the menace would not have been sufficient to authorize another to assume that his life was in danger, still if they believed from the circumstances that the defendant at the time was honestly impressed with the belief that his own life was endangered, he would be justified. As stated in the *Cumming* case, supra: "The question of what is sufficient to reduce the grade of the crime where a killing is prompted by passion is one thing, and the question of what is sufficient to excite

the fears of a reasonable man that a felony is about to be committed upon him is another and very different thing.    The Penal Code (§71) declares that 'a bare fear of any of those offenses to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing.    It must appear that the circumstances were sufficient to excite the fears of a reasonable man;' but it does not undertake to define what circumstances shall or shall not be sufficient to excite such fears.    It is true that in order to justify a homicide, there must be something more than mere verbal threats.    There must be an appearance of imminent danger.    The means of inflicting the threatened injury must apparently be at hand, and there must be some manifestation of an intention to inflict the injury presently; but it is not essential that there should be an actual assault.    Mere threats and menaces may, under some circumstances, be sufficient.    A menace is defined to be 'the show of an intention to inflict evil;' to menace is 'to act in a threatening manner.'    (Webster's Dictionary.)    Any overt act of a threatening character, short of an actual assault, is a menace; and it will not do to say, as the court in effect did in this instance, that no such act can be considered sufficient to excite the fears of a reasonable man.    If a man of reckless and violent character, who bears a grudge against me and has made threats, which have been communicated to me, that he will kill me on sight, approaches me in an angry and threatening manner, with a deadly weapon in his hand, though the weapon is not then directly aimed at me, and declares that he intends then and there to kill me, this is no more than a menace, but the law does not say: 'You shall not take him at his word until he actually assaults you; until he does, any fear you may have that he is about to carry out his threats is unreasonable; and if you kill him, although you do so under the belief that the killing is necessary to save your own life, your fears are no defense.'    To hold that this is the law would be to exclude as a defense, in such cases, the fears of a reasonable man, or to say as a matter of law that fears are unreasonable when we are not able to say it as a matter of fact.    It would in many cases render the right of self-defense practically nugatory; for it would postpone the exercise of the right until it would be of no avail.    In Wharton on Criminal Law (vol. 2, §493), it is said: 'A violent and perilous defense can only be employed in cases where there is an apparently violent and

perilous attack. To sustain such a defense, however, the actual striking of a blow is not necessary, nor is it even requisite that the assailant be within striking distance, if the attack be apparently imminent.' Mr. Bishop, after stating the doctrine that threats with no overt act and no imminent danger will not justify a homicide, says: 'Not in conflict with this rule, a threatened blow need not be actually given.' (Bishop's New Criminal Law, §872.) It has been well said that 'it is difficult to lay down a rule strictly governing all cases, the circumstances of the cases differ so widely. The overt act that will justify a defendant in assuming that his own life is then in danger must depend upon the circumstances of each particular case. Cases may be readily supposed, and no doubt often occur, where to require a defendant to wait until his adversary actually begins the combat would be to require him to wait until there would be but little chance left of successful defense,—cases where the deadly purpose of the party is so fixed and determined, his character so reckless and bloody, his use of deadly weapons so expert and skilful, that to await his attack would be to await almost certain death; and the result of the rencounter would often depend upon which party was the quicker in action'."

2. The learned trial judge charged the jury that "a mere indecent proposal to the defendant's wife, unaccompanied by any overt act on the part of the deceased to carry out such proposal, would not justify the defendant in killing the deceased." We are clear that this instruction was error prejudicial to the defendant. It was not within the province of the judge to say that an indecent proposal to the defendant's wife would not justify the defendant in killing the deceased. If upon the instant of such proposal, in the presence of the husband, the husband kills the attempting seducer of his wife for the purpose of protecting his honor, his home, and his marital rights, the question as to whether it is an instance standing upon a like footing of reason and justice as the protection of mere property or the protection of one's own person against bodily harm is a question for solution by the jury alone. We have carefully examined the cases cited by the learned counsel for the State, and in none of them is the principle stated in *Biggs* v. *State,* 29 *Ga.* 723 (76 Am. D. 630), controverted or altered. In fact we have been unable to find a case as similar in its facts to those of the *Biggs* case as is the case at bar. We deem the ruling in that case

absolutely controlling in this case, and we think it well to call attention to the language of Judge Lumpkin when he says (p. 728) : "His honor, the presiding judge, charged the jury, 'that under no circumstances of aggravation, however gross and direct, would a man be justifiable in taking the life of another, who attempts the seduction of his wife. This instruction brings up broadly the meaning of the 16th section of the 4th division of the Penal Code. After treating of the various grades of homicide, murder, manslaughter—voluntary and involuntary and justifiable—it is provided that 'all other instances which stand upon the same footing of reason and justice as those enumerated shall be justifiable homicide.' What is the meaning of this section? It signifies something. And it is the duty of the courts to give it effect. It has been suggested, that to bring cases within this provision, they must be accompanied with force. But has the legislature so limited it? Is it not more reasonable to suppose, that it was their purpose to clothe the juries in criminal cases, in which they are made the judges of the law as well as the facts, with large discretionary powers over this class of offenses; and leave it with them to find whether the particular instance stands on the same footing of reason and justice as the cases of justifiable homicide specified in the code? Has an American jury ever convicted a husband or father of murder or manslaughter, for killing the seducer of his wife or daughter? And with this exceedingly broad and comprehensive enactment standing on our statute book, is it just to juries to brand them with perjury for rendering such verdicts in this State? Is it not their right to determine whether, in reason or justice, it is not [as] justifiable in the sight of heaven and earth, to slay the murderer of the peace and respectability of a family, as one who forcibly attacks habitation and property? What is the annihilation of houses or chattels by fire and faggot, compared with the destruction of female innocence; robbing woman of that priceless jewel, which leaves her a blasted ruin, with the mournful motto inscribed upon its frontals, 'thy glory is departed?' Our sacked habitations may be rebuilt, but who shall repair this moral desolation? How many has it sent suddenly, with unbearable sorrow, to their graves? In what has society a deeper concern than in the protection of female purity, and the marriage relation? The wife can not surrender herself to another. It is

treason against the conjugal rights. Dirty dollars will not compensate for a breach of the nuptial vow. And if the wife is too weak to save herself, is it not the privilege of the jury to say whether the strong arm of the husband may not interpose, to shield and defend her from pollution?"

According to the statement of the defendant, which in this case, was corroborated by sworn testimony to the same effect, the deceased repeated indecent proposals to the defendant's wife in his very presence and hearing. Nothing should be more lightly regarded than a defense (created for the purpose of acquitting a murderer) which offers as justification for homicide a false and fraudulent claim that the sanctity of the home has been invaded. The jury should repudiate, with loathing, a sham defense of this kind. But if in truth and in fact the virtue of one's wife or daughter is really involved, and the destruction of the innocence and purity of either is imminent, it is for the jury, and the jury only, to say whether the circumstances are such that even the destruction of human life is necessary for its protection and preservation. If the killing of a fellow creature can be justified upon the ground that it was necessary to save human life, because that life, if lost, can not be restored, the same reason would seem to apply where female virtue is at stake, for its loss is also irreparable. In any event it is for the jury to determine whether there was a necessity for the protection of the virtue of one of those females to whom the duty of protection extends, and whether the circumstances were such as to call for speedy action in order that the protection afforded might be adequate. It is well recognized, of course, that the use of force can only be justified when it is necessary for the prevention of an impending danger, and that a killing in revenge for a past wrong, no matter how grievous, is murder. We are not prepared to say, however, and no court can say, as a matter of fact, that a husband who would stand by without concern and not raise a hand to protect his wife, who was being solicited in his presence to consent to prostitution, might not feel, in such a case, that his wife would have just cause for believing that he desired her to consent. If the wife was a virtuous woman, she could justly think that she was without a protector. If she was a weak woman, the husband, so far from preventing the impending danger to his conjugal rights, might forfeit the respect of his wife to such an extent as to render

her an easier prey to the seducer. In *Wilkerson* v. *State*, 91 *Ga.* 729 (17 S. E. 990, 44 Am. St. R. 63), in which the Supreme Court was considering the right of an adulterer to defend himself against the husband, and in which, therefore, the question now before us was not directly involved, Judge Lumpkin, delivering the opinion, says: "The law permits and will justify the homicide of another by the husband to prevent the seduction of the wife, or even to prevent the committing with her of a single act of adultery, if by his previous conduct he has not forfeited the right. Nay more, the law will sometimes excuse the husband for slaying the seducer of his wife, immediately after the guilty act is over, if he acts promptly and in that burst of passionate indignation which overwhelms him upon discovering the outrage which has been done him."

Section 75 of the Penal Code is not a dead letter. It is not unwritten, but written law, and leaves to the jury to determine, in every case where it is insisted that a homicide was committed in defense of the virtue of a female relative to whom the right of protection extends, the question as to whether the awful remedy of a homicide was necessary for that purpose, or whether the impending danger could otherwise have been averted, as well as whether the defense is a pretense and a sham.

3. We think the instruction of the court to the effect that the defendant would be guilty of voluntary manslaughter, if the jury found from the evidence that he was trying to eject the deceased, and that while doing so the deceased made an assault upon him, which aroused a sudden and violent impulse of passion, was injurious to the defendant, not because it is not sound law as far as it goes, but because, standing alone, it restricted his defense. Furthermore, the judge nowhere charged the jury that the defendant had the right to eject the deceased from his place of business, if the deceased refused to go upon request, and that he had the further right to use whatever force was necessary to successfully accomplish the ejection in case the deceased resisted. The court presented no instance to the jury in which the defendant, under the evidence, would have been justifiable in ejecting the deceased. The instruction of the judge was confined to supposable cases in which the defendant, seeking to eject the deceased, was aroused and angered by a blow. According to the evidence of the State no blow was stricken. According to the evidence of the

defendant he did not act under an impulse of passion. For this reason it does not seem to us that the charge presented the contentions of either party; and while the judge could properly have given the instruction complained of, it was error, injurious to the defendant to do so, unless, in connection with this statement of abstract law, the jury had been told that in a proper case the defendant might have required the deceased to leave his premises, and that if the latter refused, the defendant would have been authorized to employ whatever force was necessary to effect the ejection. While such an instance must necessarily be rare, a case is conceivable in which even the taking of human life might be necessary to clear one's home of a hardened criminal. In such a case the right is not limited by reason of the fact that the contingency or the necessity might be most unusual.

The evidence in this case is strongly in conflict in some particulars. According to the testimony in behalf of the defendant, the deceased, a large and powerful man, under the pretense of making some purchases, entered the house which was at once the store and dwelling of the defendant, and made advances to his wife, and finally, in the defendant's very presence, solicited carnal intercourse, naming the place and a time the following morning. The defendant asked the deceased to leave his house and not to insult his wife. This the deceased declined to do, sneeringly asking the defendant if he meant his request for him; and when the defendant informed him that he did, the deceased practically refused to leave, by answering the request with the most infamous abuse of the defendant. According to some of the testimony, the deceased followed this by seizing the defendant and choking him down behind the counter, when the defendant, after having appealed to the bystanders to take the deceased off, and fearing death or serious bodily injury, drew his pistol and fired the shots which caused the death. We do not undertake to say that this is the truth of what actually transpired. According to some testimony in behalf of the State, the case was one of unprovoked murder. But the jury should have been told that words, threats, or menaces, dependent upon the attendant circumstances, may be sufficient to arouse such fear of bodily danger as will justify a homicide. They should have been told that if the defendant had the right to require the deceased to leave his premises, he would

have the right to use whatever force was necessary for that purpose, and even to kill the deceased, if the jury was satisfied that he could not otherwise have been ejected. They should have been told that *they* had the right to determine whether the slaying by the husband of one who in his presence had made indecent proposals to the wife stood upon the same footing of reason and justice as instances of defense of person or property. If the jury believed that an indecent proposal was made by the deceased, and that he was asked to leave the premises, and that, under the circumstances, nothing but the use of the weapon could move the deceased, the defendant should have been acquitted. If the jury believed that the defendant was rightfully ejecting the deceased, and could not remove him and protect his wife otherwise than by killing him, the defendant would be justified by the necessity which the deceased himself had created. And regardless of the question of the objection, the jury should have been told that if they believed that the indecent proposals were made to the defendant's wife, in his presence, it was for the jury to determine, from the facts and circumstances of the case, whether the killing of the deceased was necessary for the preservation and protection of the virtue of the defendant's wife, and the preservation of his home.

*Judgment reversed.*