for appellee.

### 36360. McALLISTER v. THE STATE.

HILL, Justice.

James Peter McAllister was tried by a jury and convicted of two counts of murder and one count of aggravated assault. After receiving concurrent life sentences for the murders and a 10-year probated sentence for the assault, he appeals urging three enumerations of error.

At McAllister's trial, Larry Marsengill testified that he and Steve Perry purchased 1/4 ounce of cocaine from Joe Steele on Friday, June 22, 1979. Steve Perry sold all but two grams but, in Marsengill's words, "it wasn't any good" and the buyers wanted their money back. On Monday, June 25, Marsengill, Perry and a friend, Scott Brown, met Joe Steele at a mutual friend's apartment. Marsengill and Perry wanted to get their money back on the two grams they had not been able to sell. Steele agreed to do so but said they'd have to go to his money man to get it and said that his money man was Pete McAllister. Marsengill, Perry, Brown and Steele then drove to an apartment complex known as Club Camelot South. Marsengill drove his truck; it is not clear whether Steele rode with him or drove a separate vehicle. Marsengill parked behind one of the apartment buildings and he, Perry and Brown waited approximately 45 minutes while Steele went inside. Steele then returned and said he was going about 5 blocks away to the money man's house. Marsengill, Perry and Brown waited another 30 or 45 minutes until Kevin James appeared and said Steele and the money man would meet them at a park behind the money man's house. Kevin James then directed Marsengill to Flat Shoals Park and showed him where to park when they arrived. James, Steele,[1] and Perry rode in the back of the truck. As they all got out of the truck, shooting started. Marsengill saw Perry hit and was able to get back in the truck and drive away. He called the police and went back to the park with them. When they arrived, Brown was apparently dead at the scene and Perry, who died 10 days later, was being put in an ambulance.

Kevin James, McAllister's roommate, testified under a grant of immunity that Steele came to his apartment shortly after 11 p.m. the night of June 25, 1979. Steele told James and McAllister that there

---

[1] It is unclear from Marsengill's testimony when Steele rejoined Marsengill and his friends but it is undisputed that he rode to the park with them.

were three boys outside with guns who would kill him if they didn't get their money back for cocaine they had bought from him which Steele had sold for McAllister.[2] McAllister said he didn't have the money so they would have to kill them. He retrieved a .22 caliber pistol from a closet and gave it to Steele and then McAllister, Steele and James went to a friend's house to borrow guns. The friend (Charles Graham) didn't have any but said he knew where he could get some; he and his girlfriend left the apartment complex. James and McAllister waited by the front gate of the complex.[3] While there, McAllister enlisted the aid of an off-duty guard at the complex, Kuno Debruin. Graham returned, picked Debruin, McAllister and James up, and took Debruin and McAllister to Flat Shoals Park. He then took James back to the complex where James joined Marsengill and the others and directed them to the park. As James got out of the truck he called "Pete" three times; a shot rang out; he started running but was hit in the shoulder by the third or fourth bullet. He ran the rest of the way home. McAllister arrived about 1/2 hour later; he had been shot in the forearm and he told James two of the boys were dead and the third had gotten away, but he thought he had hit him. James also testified that McAllister told him he shot one boy in the forehead point blank twice and then beat him with brass knuckles and kicked him.

1. McAllister's first enumeration of error is that the court erred in admitting over objection testimony as to statements made by Steve Perry before his death. Steve Perry was shot in the early morning hours of June 26, 1979, and died on July 6, 1979. Dr. Lawrence Schlachter, who treated Perry at Grady Hospital, testified that when he first met Perry "he was in very bad condition, he had been shot through the lung and through the neck and he was paralyzed and he was being assisted in his breathing by a breathing machine." Perry was, however, alert (due to his paralysis, pain killing medication was unnecessary) and Dr. Schlachter advised him that he probably would not survive.[4] Dr. Schlachter also stated that in his opinion Perry most likely realized that he would not survive.

---

[2] Marsengill testified that he did not have a gun that night and to the best of his knowledge neither Perry nor Brown did either. A detective who interviewed Perry in the hospital testified, however, that Perry stated Marsengill did not have a gun but he and Brown each did.

[3] It appears that Steele might have rejoined Marsengill, Brown and Perry at this point.

[4] Dr. Schlachter did not date his conversation with Perry except by saying it occurred when he first met him.

Marsengill testified that he visited Perry in the intensive care ward of Grady Hospital the day after the shooting.[5] He said he asked Perry how he was doing and Perry answered, "Not good." Marsengill testified that Perry's breathing was labored and his voice was barely audible, but that Perry managed to say "He kicked me in the face and said Die Mother Fucker." When Marsengill asked "Who?" Perry responded "Pete."

Detective Ronnie Keith Evans testified that he interviewed Perry in the hospital on June 29, 1979; at that time, Perry was unable to speak. At the outset, Detective Evans asked Perry how he was doing, and Perry nodded no. Detective Evans then asked Perry if he thought he would make it, and Perry again nodded no. Detective Evans then asked Perry a series of questions which could be answered yes or no. He also showed Perry a six picture photographic lineup and Perry selected McAllister as his assailant. When asked if he saw McAllister shoot him, Perry nodded no, as he did when asked if McAllister struck him in the face with a gun once, twice or three times. But when asked if McAllister struck him in the face with a gun "a bunch of times," Perry nodded yes, as he did when asked if McAllister had said "Die Mother Fucker" to him.

McAllister objected to the testimony by Marsengill and Detective Evans in which they related Perry's statements on the ground that it was hearsay. The trial court overruled his objection on the ground that the statements were admissible under the exception to the hearsay rule for dying declarations.

Code Ann. § 38-307 provides that "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." McAllister argues that this testimony was not admissible because it related to the person who beat him, not to the cause of death or the identity of the person who killed him.[6] We disagree with McAllister's conclusion that the testimony was not a declaration as to the person who killed him. It is true that Perry admitted that he did not see "Pete" shoot him. But his statement that immediately after he was shot "Pete" beat him in the face and said "Die Mother Fucker" shows that "Pete" was a party

---

[5]Although Marsengill stated he visited Perry the day after the shooting, he also stated it was "Probably the 26th" and that he thought it was a Tuesday. Tuesday, June 26, actually was the day of the shooting.

[6]McAllister does not assert that Perry was not "conscious of his condition" within the meaning of the statute.

to the ambush and strongly suggests that "Pete" had shot him. See *Strickland v. State,* 167 Ga. 452 (3) (145 SE 879) (1928).

Moreover, as the defendant recognizes, this court has held that a dying declaration is not strictly limited to the physical cause of death and the identity of the killer but may include the res gestae of the homicide as part of the cause of death. *Wilkerson v. State,* 91 Ga. 729 (3) (17 SE 990) (1893); *Strickland v. State,* supra, 167 Ga. 452 (4). Defendant argues, however, that to be within the res gestae of the homicide, the declaration must be made at the time of the transaction or connected therewith in time. See Code § 38-305 (the res gestae exception to the hearsay rule). He concludes that a dying declaration must be made at the time of the transaction or immediately thereafter.

This argument commingles two separate exceptions to the hearsay rule: (1) the dying declaration exception that declarations by a person in the article of death, conscious of his or her condition, as to the res gestae of the homicide and the person who killed him or her, shall be admissible in the homicide prosecution; and (2) the res gestae exception that declarations accompanying an act, or so nearly connected therewith as to be free from all suspicion of device or afterthought, shall be admissible as part of the res gestae, Code § 38-305, supra. The court in *Bush v. State,* 109 Ga. 120 (3) (34 SE 298) (1899), was using the second exception to determine whether the statements related in the dying declaration were part of the res gestae of the homicide; that court did not hold that a dying declaration, to be admissible, must be made within the time allowed for a res gestae declaration. Headnote (1) in *Taylor v. State,* 120 Ga. 857 (48 SE 361) (1904), deals with the res gestae exception; headnote (2) of that case holds that the dying declaration of one person is inadmissible upon the trial for murder of another person. Hence, *Taylor v. State* is inapplicable here as Perry's dying declaration was admissible and there was no objection to the jury's considering Perry's dying declaration as to the murder of Brown.

Defendant has cited no case finding that a dying declaration violates the right of confrontation. See Fed. Rules of Evid., Rule 804 (b) (2), 28 USCA 689. The trial court did not err in overruling the defendant's objections.

2. McAllister's second enumeration of error is that the trial court erred in not granting his motion for directed verdict of acquittal of the murder of Scott Brown. McAllister had objected to the introduction of Perry's and Brown's death certificates on the ground that their introduction violated his right of confrontation of the medical examiner who stated the cause of death. The trial court

required that the cause of death be stricken from the death certificates. In his motion for directed verdict and on appeal, he argues that this leaves the record devoid of any evidence of the cause of death of Scott Brown. He argues that Brown could have died of a heart attack before the first shot was fired.

The evidence shows that in the early morning of June 26, 1979, Scott Brown accompanied Steve Perry, Larry Marsengill and others to Flat Shoals Park, and that when they arrived at the park they were met by a hail of bullets fired from an ambush planned by the defendant. Marsengill saw Perry hit before Marsengill fled in his truck. When he returned, Marsengill saw Perry being placed in an ambulance. He also saw Scott Brown. Marsengill testified that Brown was "apparently dead." The defendant's roommate testified that the defendant said that "two of the boys were dead and the third one got away in a pickup truck, but he thought he had hit him."

The evidence in the case is undisputed that Scott Brown is dead. His death certificate shows that he was dead on arrival at Clayton General Hospital on June 26, 1979, having been injured at approximately 1 a.m. on that date.

In a prosecution for murder, the cause of death may be shown by circumstantial evidence. *Peacock v. State,* 231 Ga. 644 (1) (203 SE2d 533) (1974); *Wrisper v. State,* 193 Ga. 157 (17 SE2d 714) (1941). There is no evidence and no reasonable hypothesis to support defendant's suggestion that Scott Brown died of a heart attack before the ambush began. We find that the evidence produced by the state was sufficient for a rational fact finder to conclude beyond a reasonable doubt that Scott Brown died as a result of shots fired from an ambush organized and participated in by the defendant.[7] Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

3. In his third enumeration of error, McAllister argues that the trial court's charge on implied malice pursuant to Code Ann. § 26-1101(a) was unconstitutionally burden shifting and asks this court to reverse *Burney v. State,* 244 Ga. 33 (6) (257 SE2d 543) (1979), cert. denied 100 SC 463 (1979). This we decline to do. *Franklin v. State,* 245 Ga. 141 (9) (263 SE2d 666) (1980).

*Judgment affirmed. All the Justices concur.*

ARGUED JULY 7, 1980 — DECIDED
SEPTEMBER 5, 1980.

*Joe H. Gailey,* for appellant.

---

[7]We note that the court charged on parties to a crime. Code Ann. § 26-801.

*Robert E. Keller, District Attorney, James W. Bradley, Assistant District Attorney, Arthur K. Bolton, Attorney General, Nicholas G. Dumich, Assistant Attorney General,* for appellee.