## COART *v.* THE STATE.

1. The Supreme Court is without jurisdiction to inquire into or consider the question as to whether any portion of the record certified and transmitted by the clerk of the trial court as a transcript of the record has been altered subsequently to the judge's certificate. This court will not hear aliunde evidence to impeach or correct a transcript of the record, and hence has no way of knowing that the statements of the motion to dismiss are true. This court has no power to reject or alter any part of the record in the case, even though it be made to appear by a certificate of the presiding judge that the record as made up in the court below is not correct. The case must be decided here upon the record which reaches the office of the clerk of this court in the manner prescribed by law.

(*a*) Since in the present case there appears in the record transmitted by the clerk the statement of the judge that " I make this note before certifying to the bill of exceptions," it must be assumed that the date July 8th, as it appears in the note of the court to the eighth ground of the amended motion for a new trial, is either a typographical mistake or a clerical error of the scrivener who prepared it; and in any event this court has no jurisdiction to correct the foregoing note or to establish a lost paper.

2. As a general rule, evidence which shows or tends to show that one accused of crime has committed another offense wholly independent

from the crime for which he is on trial is irrelevant and immaterial. There are exceptions to this rule; among them is that evidence showing or tending to show the commission of crime other than that for which the accused is on trial may be admitted for the purpose of showing motive, plan, or scheme. Under the foregoing exception, evidence to the effect that the defendant, who was accused of the crime of murder, had kissed and embraced the wife of the deceased at his home five months prior to the killing, and this was followed later by professions of affection and an effort to get the wife of the deceased to write to him, as well as by visiting her, as well as the fact that the attentions of the accused were continued until the evening of the day before the deceased was mortally wounded by the defendant, and that during that evening the defendant endeavored to make love to the wife of the deceased, and depreciated and bemeaned his own wife, and asked the wife of the deceased to promise him that if she was ever free she would let him know it, was relevant to the question of motive, and might be of some probative value as " tending to show " that the defendant's motive for killing the deceased was the desire to possess his wife. The probative value of the circumstances indicating motive is a question for the jury; but " it has long been the rule in this State, when the admissibility of evi-. dence is doubtful, to admit it and leave its weight and effect to be determined by the jury." *Goodman* v. *State*, 122 *Ga*. 111, 118 (49 S. E. 922); *Mitchell* v. *State*, 71 *Ga*. 128; *Hornsby* v. *Jensen*, 12 *Ga. App*. 696 (78 S. E. 267).

3. (a) Declarations of a decedent as to the cause of his death and the circumstances of the killing are not admissible unless it be made to appear to the court, by a prima facie showing, that the statements attributed to the deceased were made when he was in a dying condition and that he was conscious of that fact at the time the statement was made. After an alleged dying declaration has been admitted to the jury upon prima facie proof of its admissibility, nevertheless the jury should be instructed that the statements attributed to the deceased should be received and considered with great caution and should have no weight unless the jury are satisfied from the evidence that such statements were made by the deceased at a time when he was in a dying condition and that he was at that time conscious that he was dying. However, an alleged dying declaration of the victim of a homicide, which was reduced to writing, should not be rejected merely because such statement was made several days prior to his death; nor should it be repelled because the deceased had made a prior statement in writing, when it appears that the later statement of the deceased declarant, which was introduced in the trial, was the same as the one which he had previously signed and which had been read to him.

(b) The question as to whether one who did not actually die until October 27th was in a dying condition when he made a statement six days previously, is one for a jury.

(c) The consciousness of death may be inferred from the nature of the wound or other circumstances. *Anderson* v. *State*, 122 *Ga*. 161 (50 S.

E. 46); *Barnett* v. *State*, 136 *Ga.* 65 (70 S. E. 868); *Jefferson* v. *State*, 137 *Ga.* 382 (73 S. E. 499).

(*d*) The trial judge did not err in permitting the written statement signed by the decedent to go to the jury for its consideration upon rules for their guidance which were fully and correctly given.

(*e*) It was not harmful error to admit a written declaration previously signed by the deceased on October 14th, as a circumstance in corroboration of evidence of a later statement of the facts.

4. (*a*) Where in qualifying a ground of a motion for a new trial, alleging as error a misstatement by the court of a contention of the movant, the presiding judge certifies as a matter of fact that one of the counsel for the movant in fact made the contention which the movant denies having made, the qualifying certificate of the judge settles the dispute as to what really occurred; and from his statement results a disapproval of that ground of the motion.

(*b*) When a party is represented by more than one attorney and there is a conflict in the contentions maintained by counsel, it is the duty of the leading counsel to inform the court which, if either, is the real contention of his client; and in case neither of the conflicting contentions is withdrawn, it is not error for the court to instruct the jury as to the law applicable to both contentions.

5. (*a*) Under the provisions of section 75 of the Penal Code, which declares that " all other instances which stand upon the same footing of reason and justice as those enumerated shall be justifiable homicide," a husband has the right to kill to prevent the seduction of his daughter or adultery on the part of his wife, under any circumstances where the jury is authorized to draw the inference that the killing stands upon a footing of reason and justice similar to that enumerated in the doctrine of self-defense. But the paramount defensive essential in such a homicide is protection against an impending danger which, either actually or as it may reasonably appear to the slayer, can not be otherwise prevented than by the death of the assailant; and to kill in revenge for a past offense, no matter how outrageous and aggravating, is murder.

(*b*) The defense provided by section 75 of the Penal Code rests upon reason and justice; and where the circumstances which are relied upon (when judged by the rules of reason) are insufficient to support the conclusion that the homicide was committed with the idea of preventing an impending wrong, there is a failure to sustain the defense, and a conviction should result.

6. There was no substantial error in the instruction as to good character which was given; and the instruction which was requested upon that subject was so defective that it was properly refused.

7. The requests for instructions, the refusal of which constitutes the basis of the twelfth, thirteenth, and fourteenth grounds of the amendment to the motion for a new trial, were not authorized by nor adjusted to the facts of the case as developed either by the statement of the accused or the evidence on behalf of the State; and for this reason they were properly declined by the trial judge.

8. The alleged newly discovered evidence presented as reasons for a

new trial in the fifteenth and sixteenth grounds of the amended motion for a new trial is merely cumulative of facts appearing from the statement of the accused on the trial, which were uncontradicted, and therefore affords no reason for the grant of a new trial. Furthermore, as appears from the statement of the defendant, the existence of the newly discovered evidence was unknown, but the defendant was acquainted, at the time of the trial, with the facts he now seeks to prove, and he knew of other witnesses by whom these facts could be established.

9. The instruction of which complaint is made in the seventeenth ground of the amended motion for a new trial is not subject to the objection that the court confused the law as to justifiable homicide when the defendant kills in good faith under the fears of a reasonable man that he is in danger or that a felony is about to be committed upon him, with the law embraced in sections 74 and 75 of the Penal Code, which justifies a homicide by the husband in defense of the person or reputation of his wife and also to prevent future adultery with his wife, imminent or pending, real or apparent.

10. The newly discovered evidence set forth as grounds for a new trial in the eighteenth, nineteenth twentieth, twenty-first, and twenty-second paragraphs is merely impeaching in character, and for tnat reason did not require the grant of a new trial.

11. The twenty-third ground of the amended motion for a new trial was properly overruled, because irrelevant testimony, even though it can properly be denominated newly discovered, can not afford a reason for the grant of a new trial.

12. The fifth and sixth grounds of the amended motion, not being insisted upon in any of the several briefs of counsel for plaintiff in error, will be treated as abandoned.

13. The evidence authorized the finding of the jury.

No. 3345. September 24, 1923.

Murder. Before Judge Munro. Talbot superior court. June 23, 1922.

*Terrell & Foley, George C. Palmer, A. J. Perryman, John A. Smith,* and *J. R. Terrell Jr.,* for plaintiff in error.

*George M. Napier, attorney-general, C. F. McLaughlin, solicitor-general, Seward M. Smith, assistant attorney-general, Hall & Jones, A. P. Persons, J. J. Bull,* and *A. W. Cozart,* contra.

Russell, C. J. L. H. Coart was indicted for the murder of A. B. McNiece, and was tried and found guilty, with the recommendation that he be punished by imprisonment in the penitentiary for life. The evidence introduced for the State tended to show that the killing was murder, and that the motive actuating the defendant to commit the crime was the desire to possess himself of the wife of the deceased. The defendant introduced no evidence, except his statement. In the statement he set forth that he killed the

deceased in self-defense after the deceased had risen from his chair and started towards him with something in his hands which he took to be a weapon. In his statement the defendant also went at some length into the attentions which the deceased had been paying to his wife; how he had talked to the deceased three times in an effort to get him to stop his attentions; that he went to the office of the deceased on the morning of the homicide, in an effort to get him to stop his attentions, but that he had no intention of killing the deceased unless it was forced upon him in defense of his life, his wife or his home; that he had several other things planned to do that morning; that after talking with McNiece for a few minutes and again telling him to stop going with his wife, McNiece said, "I'll tell you right now, I have been intimate with your wife, we love each other and are going together just as much as we damn please, and by God you can't stop me." "He says, 'I have taken off of you all I am going to take,' and when he said that he started to rise from his chair and started towards me. His eyes were blazing and he looked like a madman, and he had something in his hands that I thought was a knife or some weapon, and I shot him." The defendant moved for a new trial upon the general grounds, and before the hearing amended his motion by embracing therein twenty-three grounds, the bases of which are hereinafter set forth. The trial judge overruled the motion for a new trial, and the defendant excepted.

1. A motion to dismiss the writ of error is made in the present case. It is based on the ground that the defendant in error has never been legally served, has not acknowledged service of any bill of exceptions in said case which specifies the record in the form and substance which it now is or at the time it was filed in the office of the clerk of the superior court of Talbot county. It is stated in the motion to dismiss that his honor George P. Munro, the judge who presided in the cause, made and signed a note to the eighth ground of the amendment of the motion for a new trial, which was as follows: "I hereby certify that A. J. Perryman, one of the attorneys for the defendant L. H. Coart, and the attorney for the defendant who made the opening argument before the jury and court at the time of the trial of the defendant and before the charge of the court was given, did contend in this case that the defendant was justifiable for the reason that the deceased, A. B.

McNiece, had seduced and debauched the wife of the defendant. I further certify that in support of that contention he read before the court and jury a part of the opinion in the case of *Biggs* v. *The State of Georgia,* 29 *Georgia,* 723; and I further certify that while J. Render Terrell, Esq., and George C. Palmer, Esq., who made arguments before the court and jury before the charge was given, did not make the same contention made by Perryman above referred to, the said George C. Palmer did cite the case of *Miller* v. *The State of Georgia,* 9 *Ga. App.* 599, in his argument; and neither the said Palmer nor the said Terrell apprised the court that they wished on behalf of the defendant to withdraw the contention made by the said Perryman. I make this note before certifying to the bill of exceptions. This the 7 day of July, 1922. Geo. P. Munro, Judge, Superior Court, Chattahoochee Judicial Circuit." The motion to dismiss then recites that on said 7th day of July, 1922, the said George P. Munro, Judge as aforesaid, after making and signing said note, signed the certificate, certifying to the bill of exceptions in said case; and immediately after said judge certified to and signed said bill of exceptions, and on said July 7th, 1922, C. F. McLaughlin, solicitor-general of the Chattahoochee Circuit, attorney for the State, defendant in error, acknowledged due and legal service in writing of the bill of exceptions and waived copy and all other and further service and waived notice, the said acknowledgment of service being the one which appears on the original bill of exceptions. And that after said service was acknowledged, and on the 8th day of July, 1922, George C. Palmer, Esq., one of the attorneys of record for L. H. Coart, the plaintiff in error, prepared and presented to said Judge Munro a note to said ground numbered 8 of the amended motion, which the said judge made and signed, and which changed the original note. The changed note is set out in the motion to dismiss.

It is insisted that as service of the bill of exceptions can not be acknowledged before it is certified by the judge, and as the change in the note of the judge to the eighth ground was made subsequently to the acknowledgment of service by the solicitor-general, the bill of exceptions has in fact never been served upon the State, the defendant in error. It must be conceded as a general rule that failure to serve a bill of exceptions upon the defendant in error

*ipso facto* works a dismissal of the writ of error. But without discussing the propriety of the change in the note to the eighth ground of the amended motion for a new trial at the request of the plaintiff in error, can it be said that there is any substantial difference between the first note as quoted in the motion to dismiss, and the second note attached to the eighth ground of the amended motion as it now appears in the record? The only difference in the two notes is the inclusion in the second note to the eighth ground of the words: " I further certify that the requests to charge, embodied and set forth in this amended motion for a new trial were submitted and handed to me by J. R. Terrell, Esq., of counsel for the defense, after the argument of A. J. Perryman, Esq., and George C. Palmer, Esq., of counsel for the defense, and at the beginning of the argument to the jury of said J. R. Terrell, who made the closing argument for the defense. I make this note before certifying to the bill of exceptions. This the 8th day of July, 1922. Geo. P. Munro, Judge, Superior Court, Chattahooche Judicial Circuit." The question sought to be presented by the motion is whether this change was so material as to so affect the rights of the defendant in error as that the inclusion of these words would nullify and destroy his acknowledgment of service upon a record containing everything exactly in its present condition except for the addition of these words.

In view of the fact that this is a capital case, and the questions presented are not only of great importance to the public but also because the issue is one of the extremest gravity to the plaintiff in error, we would not dismiss the writ of error upon a technicality if we could. And, by reason of former adjudications, we can not dismiss the present writ if we would. It is true that the defendant in error must be served subsequently to the certifying of the bill of exceptions. It is true that it is unlawful for any change in the record to be made after the presiding judge has signed the certificate, and that after the signing of the certificate he is without jurisdiction to change or alter the bill of exceptions. On behalf of the same plaintiff in error a judge can only certify one bill of exceptions; but the question here presented is one of substance and not of form. This court has held that an entry of service or an acknowledgment of service can not be traversed. This court has further held (*Clark* v. *State,* 110 *Ga.* 911, 36 S. E. 297) that it

will not hear aliunde evidence to impeach the recitals in a bill of exceptions certified by the clerk to be copies of the record; and hence the court has no way of knowing that the statements of the motion to dismiss are true. With the statement in the qualifying note to the eighth ground as it appears in the record transmitted by the clerk, containing the statement of the judge that "I make this note before certifying to the bill of exceptions," and assuming, as we must, that the trial judge, in preparing his certificate to the bill of exceptions, truly stated the date on which the bill of exceptions was certified, to wit, July 7th, 1922, we must, under the authorities, assume that the date July 8th, as it appears in the note to the eighth ground of the amended motion for a new trial, is either a typographical mistake or a clerical error of the scrivener who prepared it. For these reasons the motion to dismiss the writ of error is overruled. This court is without jurisdiction to correct the note in the present case. It cannot establish a lost paper. *High* v. *Candler,* 103 *Ga.* 86 (28 S. E. 377) *Minhinnett* v. *State,* 106 *Ga.* 141 (32 S. E. 19).

2. A review of the evidence satisfies us that the general grounds of the motion, standing by themselves, would not authorize the grant of a new trial. The statement of the defendant would of itself have authorized a verdict of guilty. However, since errors which may either cause or contribute to the rendition of a particular verdict often require of themselves the grant of a new trial, we have carefully considered the assignments of error as presented in the amendment to the original motion for a new trial. The court permitted Mrs. A. B. McNiece, the widow of the deceased, to testify that in May preceding the homicide the defendant seized and hugged her and kissed her at his home; also that he later tried to induce her to write him a letter, and on the evening of the day before the homicide told her that he had lost all affection and confidence in his wife, that the husband of the witness, McNiece, was not true to her, and asked her to promise him that she would let him know if she was ever free, — over the objection that this evidence was immaterial, irrelevant, inadmissible, and prejudicial, and charged the defendant with a separate and distinct offense from the one for which he was on trial. This is one of the grounds of the amendment to the motion for a new trial. Later the defendant moved to exclude the evidence as to the al-

leged assault, on the same grounds; and to the ruling thereon exception likewise was taken. As these two grounds of the motion involve the same question, they will be considered together.

The writer confesses to some doubt as to the propriety of admitting the proof of the alleged assault upon Mrs. McNiece. Five months elapsed between the advances and the homicide. At an earlier period in our jurisprudence the circumstance would have been considered too remote to be submitted to the jury. However the trend of modern jurisprudence does not exclude proof of other crimes or of other circumstances which tend to show intention or motive. If the testimony as to the meeting at Coart's house, when Mrs. McNiece, intending to visit Mrs. Coart, found Coart alone at home, be admissible, the remaining circumstances to which the witness testified, being far more proximate in time and circumstance, would also be admissible; and we shall therefore consider the admissibility of the testimony as to the meeting in May as judged by the rulings of this court. It is of course fundamental that motive for a homicide, or any other crime for that matter, may be shown. In homicide it is not necessary in the first instance for the State to show motive; for if a felonious killing is shown, it is presumed to have been done with malice. However, it was a right of the State to show, if it could, that the intention to kill in the particular case at bar was based upon some master motive. In every intentional homicide the law presumes malice, but proof of the underlying motive leading to the killing not only renders the verdict more satisfactory to those who love justice for justice's sake, but in many cases affords the most certain means of disclosing the identity of the slayer who otherwise perhaps would never be disclosed. For myself, I have always been inclined to think that proof of other transactions should be confined to those cases, and those only, where the identity of the culprit was in question; and this case does not present such an instance, because the killing of McNiece was not denied by Coart. However, the decisions of this court in recent years have established the doctrine that evidence of other transactions entirely disconnected from the particular crime charged are admissible, not only for the purpose of establishing the identity of the perpetrator, but also for the purpose of putting to the acid test his defense. For it may be admitted that proof of enough antecedent misdeeds will destroy

any defense and leave the accused stripped and helpless. Judged by the rulings of this court, the State had the right to show that Coart desired to possess himself of Mrs. McNiece. In the last conversation he had with her the evening before the killing, she informed him that nothing but death would separate her from her husband; and it was proper for the jury to have this evidence before them in considering his explanation of the killing, and for them to say whether he shot McNiece on account of McNiece's wife rather than on account of Coart's wife.

In the brief of the counsel for the plaintiff in error, a learned professor of evidence expresses the opinion that the admission of the testimony was certainly error, because the transaction in May was too remote to be relevant where the homicide was not committed until October. He says: " The whole theory of the State seems to be highly fanciful, and the evidence altogether too speculative to be allowed to go to the jury, especially in a case involving human life. According to Mrs. McNiece's own testimony, she repelled all of Coart's advances, and in no way encouraged him to hope for any favors from her. Therefore Coart's motive or scheme, according to the State's contention, was this, that is, Coart is supposed to reason as follows: ' Mrs. McNiece loves her husband dearly at present, and repels my advances. I will, *therefore, kill her husband, which will make me so attractive to Mrs. McNiece that she will marry me, her husband's assassin. To be sure, I must first get rid of my present wife.' All that can be said of Coart is that if he did entertain any such scheme, he should be adjudged non compos mentis on the spot. It seems to me, therefore, that the inference from the fact that Mr. Coart had shown some liking for Mrs. McNiece, or a very great liking for her, to the fact that he entertained the scheme that the State contends to have existed is wholly fanciful; in a word, a mere guess." This opinion leaves out of sight what subsequently transpired between the parties: the conversation at Juniper, and the walk to Mrs. McNiece's home, when Coart carried her books, both perhaps indicating to Coart that Mrs. McNiece was not so altogether unfriendly as her strong expressions would seem to indicate, leading him perhaps to believe that she was not unlike other women who have often said that they would not consent and yet consented. The question of the probative value of all testimony is for the jury. The ques-

tion before the judge is one of admissibility; and if testimony be relevant upon the point in issue, the judge can safely admit it without troubling himself with the thought that the probative value of particular circumstances is very slight, for the appraisement is for the jury. The judge estimates the quality of the evidence; the jury determines its quantity. The judge determines whether the substance is edible; the jury eat as much or as little of the legal food as they desire. If proof of other transactions is ever admissible except for the purpose of identification, who can say that testimony, though relating to a transaction five months old, is inadmissible where the subject is the possession of a woman? David did not scruple at the basest ingratitude, the most intense cowardice, and even murder itself, to safely possess Bathsheba; and Jacob, not for five months, but for seven long years, labored faithfully and well for Laban, buoyed by the hope that at the end of that long time he should possess Rachel, the object of his love. Somehow in the economy of nature there is nothing stronger than sexual affection, and by this I mean primarily affection between the sexes; and long before Leander swam the stormy Hellespont to embrace Hero, and ever since, love, whether pure and blessed by God or impure and inspired by the devil, has been the monarch of human passions. The learned professor from whom we have quoted says, in effect that if this was the motive that inspired Coart he is legally insane and by law irresponsible.

There was no plea of insanity in this case; and, as long ago pointed out by Judge Bleckley in *Tatum* v. *State*, 59 *Ga.* 638, 640, neither the entire absence of *direct evidence* of motive, nor inconsistent or foolish conduct in one's progress to the actual crime may be sufficient to rebut the presumption arising from the act itself; on the contrary, even foolish conduct may throw a flood of light upon an underlying motive. To the argument that the defendant's reasoning was illogical, as now insisted here, Judge Bleckley replied: " Men, even when their ends are wise and virtuous, do not always select the best means at their command. There is no presumption that those having foolish and wicked ends in view are either more discreet or more fortunate. It is a great blunder to engage in crime at all, and how many subordinate or secondary blunders may occur in the course of a criminal transaction is mat-

ter of much uncertainty. It is said that there had been no dispute, and nothing to engender malice; and that if the prisoner's motive was to plunder his fellow-travelers, he might have accomplished this purpose while they were asleep, with even greater security than by attempting to slay them one at a time. But this is to suppose the prisoner guided by correct reasoning, when the strong probability is that he was guided by false reasoning. He acted like a fool, and it is altogether unlikely that he reasoned like a philosopher."

Many human beings have been insanely in love; but fortunately for us, the test of legal sanity in Georgia is the ability to distinguish between right and wrong as to the particular act about to be committed, and many of those insanely in love were fortunately so sane that this madness did not lead them to violate the law of the land. Under the rulings in *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016), *Boone* v. *State,* 145 *Ga.* 37, (88 S. E. 558), and *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286), the trial judge did not err either in admitting the testimony of Mrs. McNiece or in refusing to exclude it.

3. In the third ground of the amended motion for a new trial the plaintiff in error excepts to the admission of a written statement signed by the deceased a few days before his death, which was submitted by the court to the jury as prima facie admissible for consideration as a dying declaration. This statement is as follows: "On the morning that Major Coart shot me, I went into Mr. Pinkston's office to see him, and Major Coart was sitting there. I did not know that Coart was in the office. When I entered, Major Coart spoke and said that he would like to talk to me. I told him, all right, to come into my office. We walked into my office. Major Coart closed my office door as we entered. I sat down at my desk, and Major Coart continued to stand up and he never did sit down. The first thing he said was, he understood that I was criticising him for walking home with Celeste, my wife, after dark. I told him that I had not criticised him, because I felt that her character was such that she could be trusted alone with anybody. He then accused me of inviting Mrs. Coart to go to Collingsworth Church to quarterly meeting. I told him that I did not invite her, that my wife invited her. He then said, ' There is a lie out ' — that my wife said I invited her." I replied that ' that was all

right — that I was responsible for my wife and myself both.' He then began to enumerate insinuations against Mrs. Coart, dating back 6 years, which reflected upon her and which had no reference or connection with myself; and I told him that I didn't care to hear it, that I would not believe him on his oath about anything that reflected on Mrs. Coart. He then pulled his concealed pistol from his right hip-pocket — he snapped it at me twice, and then shot me. I had no weapon — not even a knife, and was given absolutely no chance to defend myself. Major Coart shot me without cause or provocation. This is all that occurred in my office, and all that was said at the time of the shooting. On the morning that Major Coart shot me in my office he didn't even refer to, intimate, or suggest any improper or indiscreet conduct on my part; in fact, he made no reference whatever to me or to Mrs. Coart that would indicate that he had any complaint or grievance against me relative to my conduct towards Mrs. Coart or her conduct towards me. The relations between myself and Mrs. Coart have always and only been that of a perfect gentleman and lady." This statement is signed by A. B. McNiece. Prior to permitting the introduction of this writing the court heard testimony as to whether the declarant was in a dying condition at the time the statement was alleged to have been made, and as to the declarant's consciousness of that condition; to which we shall later refer.

To determine the correctness of the court's ruling and the validity of the objection urged by the plaintiff in error, both must be measured by the law upon that subject. The term "dying declaration," as commonly used, refers to a form of hearsay evidence, generally inadmissible, which has for centuries been permitted from the necessity of the case. The repetition of the statement of the deceased was originally confined to evidence from one who heard this statement as to the person who killed him and the manner in which death was produced. With the passage of time the scope of the statement which may be repeated has been greatly enlarged and extended; and section 1026 of the Penal Code says: " Dying declarations, made by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, are admissible in evidence in a prosecution for the homicide." Upon a prima facie showing the court should admit the alleged declaration if it conforms to the require-

ments of the statute. *Jones* v. *State,* 130 *Ga.* 274 (60 S. E. 840).
The jury may still reject this declaration, as they may reject all
testimony which they may be satisfied is untrue; but the jury al-
so has the right and duty to determine whether the declaration was
made in the article of death, and also whether the declarant was
conscious that he was in a dying condition. The record in this case
shows that the learned trial judge correctly charged the jury upon
this point; and hence we have only to consider, in determining the
validity of the objection presented by the defendant, whether the
court erred in holding that a prima facie case had been made
which authorized the submission of the alleged dying declaration
to the jury for their consideration. In every case the utmost care
should be observed in the admission of this class of testimony; for
scarcely any evidence is more likely to impress the jury if they
are satisfied that the statement was made by one who was thorough-
ly conscious that he must very shortly appear before the Great
Judge of all the earth. It appears from the testimony in this
case that the deceased, Mr. McNiece, was shot on the morning of
October 11, 1921, and died on the 27th day of October thereafter.
According to the testimony of the attending physician his wounds
were of such a nature that recovery therefrom is very problematical
and extremely rare. McNiece was an intelligent man. That he
apprehended death can not be doubted, not only from his words
with his nurse, but also from his conduct in dictating a written
statement on the 14th of October, several days before his death.
Naturally in his weakened state a week later, the conviction that
he was going to die, "that they cannot pull me through," had
with good reason become stronger than before. All external in-
dications as shown by the chart of the nurse showed a physical
weakness of which the patient must have been conscious.

Conceding that he believed that he was about to die when the
statement of October 21st was made, the all-important question
arises, was he in "the article of death"? Logically and legally this
is the first question to be answered; but under the evidence in this
case we have referred to the circumstance as to his consciousness
or belief first, because there seems to be no question that he be-
lieved for several days that he was going to die; and so far as the
truthfulness of the declarant being affected, belief is synonymous
with the word "consciousness," if one really believes that he is

going to die; though as a rule of evidence the declaration made by one who does not in fact die cannot take in the statement of one wounded, because the necessity for such testimony has been obviated, and original and not hearsay evidence is accessible, to say nothing of the fact that the case to be investigated can not be one of homicide. Was the declarant in a dying condition at the time he signed the paper on October 21st? He did not die until October 27th; and the question therefore arises, is there any case in which a patient may be for six days in a dying condition? When we consider the thousands who die of lingering diseases, there can be but one answer, for thousands annually succumb to cancer and tuberculosis who are perhaps for weeks in a condition where death may come at any minute, and yet no human calculation can determine with exactness the moment when the final hemorrhage will supervene or the golden cord be broken. This court has held that it is not essential to the admissibility of such declarations that the declarant at the time of making the dying declaration should express himself as conscious of the fact that he is in a dying condition — in the article of death, — for this consciousness may be inferred from the nature of the wound or other circumstances. *Anderson* v. *State,* 122 *Ga.* 161, *Barnett* v. *State,* 136 *Ga.* 65, and *Jefferson* v. *State,* 137 *Ga.* 382 (supra). After a careful review of the evidence adduced to the court before the instroduction of the written statement, we are satisfied that the trial judge did not err in permitting it to go to the jury for its consideration under rules for their guidance which were fully and correctly given.

In another ground of the amended motion exception is taken because the court permitted to be introduced a written statement made by the deceased on October 14th, which was identical with the one signed on October 21st. The objection urged is that the statement was irrelevant, immaterial, and prejudicial, and that it did not prima facie appear that the declarant was in the article of death and conscious of his condition at the time the same was made. The admission of this paper, if error at all, was not such as would have affected the result; and we think that under the circumstances of this trial the paper was properly admitted. There was testimony that at the time Mr. McNiece signed the statement of October 21st he asked if the contents of the writing were the same as the statement which he had previously dictated and signed on

October 14th, and, on being answered in the affirmative, stated it was unnecessary to read it to him again. The statement having been signed by McNiece, neither the court nor the jury could know that the information which was given to McNiece and upon which he relied in dispensing with the reading was the truth, unless an opportunity for comparing the two were afforded. The declaration of October 14th was admitted purely as a corroborative circumstance, and the judge stated at the time of its admission that it was to be considered for that purpose only. Under the evidence as to the final statement, the statement of October 14th was really a part of the res gestæ of the final declaration.

4. In the eighth ground of the amended motion for a new trial complaint is made that the court erred in charging the jury as follows: "Now, gentlemen, the defendant contends in this case that he was justifiable for the reason that the deceased had seduced and debauched his wife, and on that account that he was justifiable in slaying him." The plaintiff in error insists that he "never did contend in this case that he was justifiable for the reason that the deceased had seduced and debauched his wife, and on that account he was justifiable in slaying him. Movant made no such contention, neither did he make any such defense. On the other hand and to the contrary movant contended that he shot the deceased to prevent him from having any repeated and continued adulterous relations with his wife, and not for any such past relations; for defendant in his statement said that the deceased at the time of the shooting said to defendant: 'I'll tell you right now, I have been intimate with your wife, we love each other, we are going together just as much as we damn please, and by God, you can't stop me.' He says, 'I have taken off of you all I am going to take,' and when he said that he started to rise from his chair to come towards me.'" To this ground of the motion the judge attached the following qualifying note: "I hereby certify that A. J. Perryman, one of the attorneys for the defendant L. H. Coart, and the attorney for the defendant who made the opening argument before the jury and court at the trial of the defendant and before the charge of the court was given, did contend in this case that the defendant was justifiable for the reason that the deceased, A. B. McNiece, had seduced and debauched the wife of the defendant. I further certify that in support of that contention he

read before the court and jury a part of the opinion in the case of *Biggs* v. *The State of Georgia,* 29 *Ga.* 723; and I further certify that while J. Render Terrell, Esq., and George C. Palmer, Esq., who made the arguments before the court and jury before the charge was given, did not make the same contention made by Perryman above referred to, the said George C. Palmer did cite the case of *Miller* v. *The State of Georgia,* 9 *Ga. App.* 599, in his argument; and neither the said Palmer nor the said Terrell apprised the court that they wished on behalf of the defendant to withdraw the contention made by said Perryman. I further certify that the requests to charge embodied and set forth in this amended motion for a new trial were submitted and handed to me by J. Render Terrell, Esq., of counsel for defense, after the argument of A. J. Perryman, Esq., and George C. Palmer, Esq., of counsel for defense, and at the beginning of the argument to the jury of said J. R. Terrell, who made the closing argument for the defense. I make this note before certifying to the bill of exceptions. This the 8th day of July, 1922. Geo. P. Munro, Judge, Superior Court, Chattahoochee Judicial Circuit."

From the qualifying note of the judge it will be seen that at least one of the counsel for the defendant presented the contention that the accused was, as a matter of law, justifiable for that he killed the deceased because the latter had been committing adultery with the wife of the accused, and that no withdrawal of this contention was made by either of the two attorneys for the defendant whose arguments followed that of the opening counsel for the defendant. In theory at least, the counsel who opens the argument in behalf of a party who is entitled to the opening and conclusion is supposed to state the legal propositions upon which that party relies; and for that reason statements made by counsel in opening must generally be considered as authoritative and binding, unless withdrawn. As certified by the trial judge, neither of the two attorneys who later argued for the defendant corrected or disclaimed the legal position assumed by the attorney opening the argument; and this fact coupled with the defendant's statement fully authorized the language used in the excerpt from the charge of which complaint is made. Furthermore the question as to whether a particular sentence in a charge is or may have been prejudicial or erroneous can rarely, if ever, be determined by the

consideration of this dissevered fragment apart from its setting. In the present instance an examination of the entire charge of the trial judge, in which he merely alluded to the contention as stated by one of the defendant's counsel, discloses that the statement of the contention was followed by proper instructions as to the scope and effect of the provisions of section 75 of the Penal Code, in which the real defenses sought to be presented as now contended by the plaintiff in error were accurately and clearly presented to the jury. It seems that in the present case the learned counsel for the defendant differed in their views as to the law. Such a situation naturally presents a dilemma to the trial judge. He must instruct the jury correctly as to such law as is involved in the particular case. He must present to the jury with fullness and fairness the contentions of each party. Where counsel differ among themselves as to the contentions of their client, and do not call for a decision from the court, why should the trial judge, who is required to present the law applicable to the contentions of that party, do otherwise than to present each and all of the contentions? The situation is to some extent similar to that occupied by a trial judge in a case where the defendant files, as he may do, totally inconsistent and contradictory defenses in a civil case. In such cases it would be the duty of the judge to give in charge to the jury the law applicable to each defense; and it would be no answer to an exception alleging an omission to instruct on one of these defenses, that the judge was of the opinion that the particular defense omitted was not relied upon, when the defendant through his counsel was insisting upon it. Authorities upon the point that the judge must fairly present the contentions of a party are ample; and authorities that it is error to fail to present the substantial contentions are equally abundant.

The trial judge in the present case, in the conflict raised by the counsel and not by the court, had no means of determining himself which contention embodied the reliance of the defendant for an acquittal. If counsel for a party differ among themselves as to the law, the right of determining the real position of the client rests with leading counsel, and it would seem to be his duty, having the case in charge, by withdrawing any misstatement of his client's position to apprise the court and jury of his client's true position and his exact contention. It does not appear from the

record upon which of his attorneys the accused mainly relied, but there was no withdrawal or disclaimer, on the part of either of the able lawyers who concluded the argument for the defendant, of the language or contention stated in the opening argument; and we therefore hold that it was not error for the court to refer to the contention of the accused as presented by each and all of his attorneys. This the court did, and the reference to the argument of which complaint is made, and which the plaintiff in error seems now to seek to disclaim, would no doubt have been omitted had the disclaimer been made before instead of after the verdict.

5. In the ninth and tenth grounds of the amended motion are presented exceptions to the charge of the court, as to the right of the husband to kill one who has committed adultery with his wife. The defendant presented two requests to charge, which the court refused to give, and which we shall consider. The request embodied in the ninth ground is as follows: "The killing of A. B. McNiece by the accused, if necessary, or apparently so to a reasonable mind, in order to protect the wife of the accused at the time of the killing, would be justifiable. The killing must be necessary, or apparently so, to prevent the deceased from accomplishing his purpose then and there, or from continued adulterous relations with the deceased's wife, if the jury believe that this protection, in the particular circumstances of this case, would be an instance standing upon a like footing of reason and justice with the defense of her life or his own." That embodied in the tenth ground is as follows: "The judge charges the jury that the husband had the right to prevent the deceased from having repeated sexual intercourse with his, the defendant's wife, and, if necessary to prevent such continued acts of sexual intercourse, to take life. The accused had the right, under the law, not only to prevent sexual intercourse with his wife then and there, but a repetition of such intercourse or a recurrence of such act that might then and there be impending." The question raised by both of these assignments of error is, when can a husband, under the laws of Georgia, be justified in killing one who has committed adultery with his wife. The right to kill, if such right exists at all, must rest upon the provisions of section 75 of the Penal Code, which declares that "All other instances which stand upon the same footing of reason and justice as those enumerated shall be justifi-

able homicide." As has frequently been held, the language of this section is not an exposition of any "unwritten law," but is a well-defined principle of the law reduced to writing. *Rossi* v. *State, 7 Ga. App.* 732 (68 S. E. 56); *Miller* v. *State, 9 Ga. App.* 599 (71 S. E. 1021). Into the application of this section must always enter the idea of prevention of an impending wrong; and since instructions to a jury must always be adjusted to the evidence, there must be an exclusion of the concept of revenge for past wrong, no matter how outrageous. Under the evidence in this case, and especially under the very statement of the defendant himself, the jury would not have been authorized to draw such an inference that the killing in the present case stood upon a footing of reason and justice similar to that embraced in the doctrine of self-defense. The controlling central essential of self-defense is protection against an impending danger which, either actually or as it reasonably appears to the slayer, can not be otherwise prevented than by the death of the assailant. There is no doubt that this right of self-defense extends to near relatives, and that the same law extends to the protection of one's wife and daughter. The provisions of section 75 of the Penal Code are not meaningless, nor is the law therein embraced obsolete.

But where one sets up as a justification for a homicide that the killing was done to protect his wife or child, it must appear, prima facie at least, that the circumstances of the killing place the homicide within the realm of reason and justice. It has so often been decided by this court that a killing to avenge a past wrong can not be justified (though it may be reduced to voluntary manslaughter when the jury has doubt as to whether the homicide may not have been committed in the sudden heat of passion) that citation of authority upon that point is unnecessary. In determining whether the requests above quoted were pertinent and applicable to the defendant's statement or to any phase of the testimony, we shall make a brief summary and review of the statement and evidence upon that point. Of course the State insists, as McNiece in his alleged dying declaration declared that no illicit relations had ever existed between the deceased and the wife of the defendant, that McNiece had no intention of debauching his neighbor's wife, and that therefore there was no impending wrong to prevent. There can be no other inference from the defendant's

statement than that. for a period of several months McNiece had maintained at will adulterous relations with Mrs. Coart. According to the statement of the defendant, upon three different occasions prior to the last meeting at the time of the homicide Coart had discussed the matter with McNiece and begged him to desist. The defendant had been informed of the state of affairs by numerous friends, and he had sought advice from others as to the proper course to pursue. Within the period embraced by his knowledge of his wife's treachery and infidelity he had frequently exchanged hospitality with the deceased. Under these circumstances, if McNiece in fact had not indeed been criminally intimate with the wife of the defendant, the killing was inexcusable murder; and on the other hand, if McNeice was guilty, as the defendant knew and had been informed, then the conduct of the defendant was a continuing consent and license to McNeice, which precluded the defense that he killed to prevent an impending wrong which he himself had tacitly authorized. See *Wilkerson* v. *State,* 91 *Ga.* 729, 734 (17 S. E. .990, 44 Am. St. R. 63). It is very questionable whether a husband can justifiably kill one who has committed adultery with his wife after the completion of the sexual act. It has been held that he may justifiably kill to prevent the act; he may kill while the act is in progress, and the law will justify him; and the law in its humanity has brought within the terms of § 75 a husband who kills the adulterer immediately after the act has been completed, the later decision being justified more as a concession to that righteous and justifiable indignation which is a natural concomitant of those holy feelings upon which love of home and the protection of its purity must of necessity rest.

Since the judge in the first instance must charge according to the evidence, including the statement, and since the instances of justification which are referred to in section 75 of the Penal Code must be determined by reason and justice, a judge is not required to give in charge instructions based upon that section unless either the evidence or the statement of the defendant, reasonably construed, places the case within the wise provisions of that section. It goes no further than to declare that in all instances standing upon a like footing of reason and justice as those governing the law of self-defense one may kill to prevent an impending wrong. We have alluded to instances where killings by either wife or hus-

band of an adulterer with his or her mate have been justified; but it has never yet been held, so far as our investigation has extended, that either wife or husband can lawfully kill a known paramour of his or her mate upon the idea of preventing an irreparable wrong. Based upon " reason," a wide difference is to be noted between the case of a married woman and an unmarried virtuous female. One has experience of the sexual relation and the other has none. The wife is under the obligation of a civil contract as well as a solemn vow of fidelity, while the other is unfettered in these respects. The one is supposed to be, and should be, wholly absorbed in the great and controlling love for her mate; the other may be heart whole and fancy free. Within the legal definition of seduction as contained in the Penal Code, § 378, a *wife* can not be seduced, and therefore such a phrase as " the seducer of his wife " is not authorized by law and is an utter misnomer. Even the most virtuous wife may be raped, but the expression that a " wife was seduced " means nothing more than that the woman, devoid of proper affection for her husband and false to her vows, yielding either to animal passion or something else, voluntarily consented to an unholy criminal intercourse the consequences of which she fully knew and which she only expected to escape by not being detected.

In the case at bar, applying the gauge of reason and justice as embodied in § 75 of the Penal Code, and taking the statement of the defendant to be the truth, the facts presented by him can not support the inference that what he did was to save the purity of his home and the virtue of his wife. Killing for either of these two purposes would be justifiable under the provisions of § 75. The *Biggs* case, 29 *Ga.* 723 (76 Am. D 630), and the *Rossi* case, 7 *Ga. App.* 732 (supra), in which the writer delivered the opinion of the court, were both cases in which the virtue of the wife was unspotted and unstained, and it was a proper matter of consideration by the jury whether the evidence in the case placed it on the same footing of reason and justice as the repelling of a felonious assault. According to the statement of the defendant, his home had already been ruined, his wife had been forever stained and frequently debauched, all at her own desire and with her own consent; and in enforcing the wise provisions of § 75 (provisions that are intended to include any case not otherwise enumerated where a man's family is threatened by either impending disgrace

or danger), it can not, in our opinion, be said that prevention of future adultery springs from aught else except revenge, because under no principle of reason can it be said that a reasonable man would desire to continue such a home or to continue relations with such a wife. This view is strengthened by the statement of the accused that he candidly discussed with the deceased the illicit relations of the latter with his wife, which certainly no self-respecting man, and in our opinion no reasonable man, jealous of the honor of his home, would have done. In defining reasonable fears it has often been held that the impending fears must not be those of a coward; and the conduct of the defendant as related by him tends rather to support the theory of the State that the motive for the shooting was desire for the widowhood of Mrs McNiece, rather than the doubtful hope of restoring the chasity of the wife of the defendant — who, the defendant says, had for months informed him that she had no love for him and who would not even allow him to share her bed. There is no complaint that the court did not correctly charge the jury upon the principles of self-defense as related to the instance detailed by the defendant in support of his belief that McNiece was about to assault him with a weapon at the time of the shooting.

6. There are two assignments of error upon the charge of the court upon the subject of good character. In the seventh ground of the amended motion for a new trial exception is taken to the following charge: "Now, gentlemen, under the law the defendant is permitted to introduce evidence of good character. The defendant is permitted in making his statement to put his character in evidence. The defendant in this case has put his character before you, to be considered as a matter of his defense, by making a statement that he has always borne a good character. Hence it becomes my duty to charge you the law in regard to good character. Evidence of good character may of itself be sufficient to justify a reasonable doubt as to the guilt of the accused, or considered in connection with the other evidence it may be sufficient to create such a doubt. Nevertheless, if the jury should believe beyond a reasonable doubt that the defendant is guilty, as charged in the indictment, you would be authorized to convict, notwithstanding evidence of general good character." In the eleventh ground the exception is based upon the refusal of the judge to

charge the jury, upon a request in writing duly presented, " that good character is a substantive fact in defense of one charged of crime, and may of itself alone be sufficient to generate a reasonable doubt." It is insisted that this instruction should have been given, because it was particularly adjusted to the facts of the case, and that the court erred in declining to give the exact words used in the request, although the general principle involved might have been given in the original charge. The excerpt from the charge quoted in the seventh ground constituted the entire charge of the court upon the subject of good character. It is insisted by the movant that the charge above quoted is not a correct statement of the law; that he jury should consider the good character of the defendant as a substantive fact tending to establish the defendant's innocence, and not be restricted to the consideration of " evidence of general good character," and, inasmuch as the defendant did not offer evidence of his good character but placed it in issue by his statement alone, that the charge qualified the right of the defendant to place his character in issue by his statement alone. The assignment of error upon the omission of the court to charge as requested is that " this request was a legal and pertinent one, particularly adjusted to the facts of the case, and should have been given, and the court in declining to give it committed error, although the general principle might have been given in the original charge." The questions raised in the seventh and eleventh grounds of the motion are, first: whether the instruction as given was erroneous; and second: whether the court erred in not telling the jury in express terms, as requested, that good character is a substantive fact.

It is very plain that the judge did not " qualify the right of the defendant to place his character in issue by his statement alone," because the judge told the jury at the very outset that the defense of good character in the case before them was presented by the statement; and by the words, " hence it becomes my duty to charge you the law in regard to good character," the charge placed the statement of the defendant as to good character on an equal plane with the evidence in the case. We are of the opinion that the instruction given is a correct statement of the law, for the judge told the jury that good character may *of itself* be sufficient to justify a reasonable doubt as to the guilt of the accused, or considered

in connection with the other evidence it may be sufficient to create a reasonable doubt. The words *of itself* could not be misunderstood by the jury, and the words *of itself* as used are the equivalent of and synonomous with the word *alone* in the instruction which was requested. It is true that the judge added to his instructions as to the use of evidence of good character the converse of the proposition, by saying to the jury that if they should believe the defendant was guilty as charged, they would be authorized to convict notwithstanding evidence of good character, as in fairness to the prosecution he should have done. A trial judge is not required to give in charge, in response to a written request, instructions which are incorrect, misleading, or incomplete; and for this reason the trial judge did not err in refusing the request as presented. To have charged the jury as requested the judge would have omitted, to the injury of the accused, the benefit of the principle that even though the evidence of good character of itself alone should not generate a reasonable doubt, the accused is still entitled to have the evidence of good character considered along with the other evidence in the case, because the evidence of good character, though not strong enough of itself to create a reasonable doubt, may, when considered with the evidence, raise such reasonable doubt as to authorize an acquittal. The requested instruction was also defective because it did not inform the jury that mere evidence of good character can only be used to engender doubt as to the guilt of the accused, and that in a case where the jury are perfectly satisfied beyond a reasonable doubt of the guilt of the accused the character of the defendant, no matter how good it may be, affords no ground for acquittal. We are of the opinion that the instruction as to good character by the court was not incorrect or harmful to the accused for the reasons assigned, and the court did not err in declining the request in the form in which it was presented. The language used by the court in his charge embraced the idea that good character is a substantive fact; and if the accused desired the use of the particular words "substantive fact," they should have been incorporated in a request so full and correct that the court would not have been authorized to decline it for defects.

7. We think that the trial judge properly refused to give in charge to the jury the requested instructions contained in the

twelfth, thirteenth, and fourteenth grounds of the amendment to the motion for a new trial. This for the reason, if no other, that the instructions were not adjusted to the facts as set forth either in the evidence or in the statement of the accused. The instructions of the court should always be pertinent and adjusted to the evidence. The request set forth in the twelfth ground is as follows: " I charge you, gentlemen of the jury, that if a man and his wife be living together in the holy bonds of matrimony, and in virtue and in peace, and another man should become the seducer of such woman, or an adulterer with her, or should attempt to do so, her husband would have the right to defend her and to defend himself from such injury, and to use just such force as under the circumstances was necessary for that defense, and to make it effectual and complete. The Penal Code enumerates certain instances of justifiable homicide, and then in section 75 sets forth this general provision: " All other instances which stand on the same footing of reason and justice as those enumerated shall be justifiable homicide." It will be noticed that the condition referred to in the request is that of a husband and wife living together " in virtue and in peace." The evidence for the State makes no reference as to how the defendant and his wife were living, and according to the statement of the defendant in the present case no such condition as this existed. According to the statement of the defendant his wife was not living with him in virtue, nor had she been virtuous for several months. Therefore, for the reason that the instruction was not adjusted to any view of the facts, the judge was not obliged to give the instruction or to correct it. Furthermore, while the husband would have the right to defend himself and his wife against the attempt of an adulterer to debauch his wife, the court could not (under the facts appearing in this record and for the reasons stated in the discussion of the ninth and tenth grounds, supra) charge the jury that the husband could kill another who had become an adulterer with his wife. Under the facts disclosed by the defendant's statement, Mrs. Coart could not have been seduced by McNiece at the time of the killing or at any time in the future, even if she had been his unmarried daughter instead of his wife, because seduction is intercourse for the first time with " a virtuous unmarried female," and there can not be numerous seductions of a virtuous unmarried female, even though there be numerous intercourses.

In the thirteenth ground of the amended motion the request which was refused is as follows: " The judge charges the jury that if a man takes the life of another who attempts the seduction of his wife, under circumstances of direct and gross aggravation, it is for the jury to say whether the case stands' upon the same footing of reason and justice as other instances of justifiable homicide enumerated in the Penal. Code." This request contains a sound principle of law, but was properly refused by the judge, because it was inapplicable to the case on trial. The principle of law requested applies to one who attempts the debauchery of the wife of another; and for the reasons already indicated above, there is nothing in the record to show that the deceased was attempting "seduction" at or about the time that he was killed. The only apprehension that the defendant could reasonably entertain was the repetition in the future of continued debaucheries. For the same reasons as have been mentioned in dealing with the twelfth and thirteenth grounds of the amended motion, the trial judge did not err in refusing the request to instruct the jury as follows: " I charge you, gentlemen of the jury, that a man would have the right, nay it would be his duty, to protect and defend his wife against any assault upon her virtue by either a seducer or an adulterer. In this State the husband is the head of the family; the wife is subject to him; her legal civil existence is merged in the husband, except so far as the law recognizes her separately either for her own protection or for her benefit, or for the preservation of public order. And it would be the duty of a wife to conform to any reasonable and just regulations the husband may lay down for guiding her conduct or choosing her associates, and it would be the duty of all other persons to acquiesce in the husband's authority or directions, so far as known in respect thereto; and if any man should violate this principle for the purpose of adultery, or seduction, and by open force, or deceit, or fraud, come between husband and wife, the husband would have the right immediately and swiftly to resort to force for the expulsion of such intruder, and, as before stated, to use just so much force as was necessary, and even to slay the aggressor if such killing should be actually necessary in order to protect and defend his wife." This case is not one where an assault (which is an attempt to commit a violent injury upon the

person of another) might or could have been made upon the virtue of the wife. According to the statement of the defendant, the citadel of virtue had been broken down. Innocence had been supplanted by lust. The caresses of the husband had become offensive and nauseant to the wife while she joyed in the bread eaten in secret with a paramour. As to the remainder of the instruction which was requested as to the civil relationship of husband and wife, we can not say that the trial judge did not correctly omit all reference to the subject, especially as we are not prepared to say that "it would be the duty of all other persons to acquiesce in the husband's authority or directions, so far as known." There are many urgent reasons which compel a wife's adherence to virtue, and a killing by a husband may be justified to protect that virtue; but as the writer has had occasion heretofore to remark, the legal headship of the husband as a member of the family is in some matters more or less mythical nowadays and save as to the matter of unstained virtue there are many occasions on which she may be authorized to violate regulatory rules ordained by her husband.

8. The fifteenth and sixteenth grounds of the amended motion are based upon alleged newly discovered evidence as to criminal sexual intercourse between McNiece, the deceased, and the defendant's wife. The fifteenth ground relates to an instance at Coart's home, and the sixteenth to evidence of an adultery in the woods near Juniper pond. The statement of the defendant, upon which he was content to rely, if credible, was sufficient to have satisfied the jury that the deceased and the wife of the defendant had been criminally intimate for quite a long period of time before the homicide; so the evidence upon which the new trial is sought is clearly cumulative and affords no ground for a new trial. Penal Code, § 6086. The defendant may not have known of the existence of the particular witnesses on account of whose testimony the new trial is sought, but his statement shows that he knew of more than one witness by whom he could have proved the infidelity of his wife; so these grounds of the motion may more properly be said to be based upon newly discovered witnesses than upon newly discovered evidence.

9. In the seventeenth ground of the motion error is assigned upon the following charge of the court: "In determining the question of whether under the facts and circumstances of the

case, the defendant is guilty of the offense of murder as charged in
the indictment, I charge you that if the jury should believe that
if the defendant did shoot and kill Mr McNiece in the manner
therein charged, with intention to kill, and that at the time of
such killing the circumstances were not such as to excite the fears
of a reasonable mind that the defendant was in any danger from
the deceased, and furthermore, that the circumstances were not
such as to convince a reasonable mind that it was necessary to kill
McNiece in order to prevent the seduction of the wife of the de-
fendant by the deceased, or to prevent an act of adultery on the
part of the deceased with the wife of the defendant, but that the
killing was done deliberately and in revenge of a past act, or sup-
posed act, of adultery on the part of the deceased with the wife
of the defendant, or in revenge of a past assault or attempt or
supposed effort or attempt on the part of the deceased to have
sexual intercourse with the wife of the defendant, then in such
event you would be authorized to convict the defendant of murder,
as charged in this bill of indictment." Error is assigned upon
this instruction, upon the ground that the court confused the law
of justifiable homicide under the fears of a reasonable mind, as
embraced in sections 70 and 71 of the Penal Code, with the law
embraced in sections 74 and 75 of the Penal Code, which justifies
a homicide by a husband in defense of the person or reputation of
his wife, and also to prevent future adultery with his wife, im-
minent or impending, and left the jury unable to differentiate
between the different provisions of the law above cited and re-
ferred to. We can not sustain this criticism. It is true that un-
der the provisions of § 74 there are instances in which a killing
may be justified in protection of one's reputation. However, in
this case no such defense was presented by the defendant in his
statement, or suggested by the evidence in behalf of the State.
The instruction as a whole was correct, and the statement that " if
the circumstances were not such as to convince a reasonable mind
that it was necessary to kill McNiece in order to prevent the
seduction of the wife of the defendant, or to prevent an act of
adultery on the part of the deceased with the wife of the defend-
ant, but that the killing was done deliberately and in revenge of
a past act, or supposed act, of adultery on the part of the deceased,
or in revenge of a past assault or attempt or supposed effort or

attempt on the part of the deceased to have sexual intercourse with the wife of the defendant, then in such event you would be authorized to convict the defendant of murder," was also correct; and if fuller instructions on this particular feature of the defense were desired, they should have been appropriately requested.

10. The eighteenth, nineteenth, twentieth, twenty-first, and twenty-second grounds of the amended motion are based upon alleged newly discovered evidence as to the lack of chastity upon the part of Mrs. A. B McNiece, one of the witnesses for the State at the trial. Without ruling upon the admissibility of this testimony (in view of the rule that character cannot be shown by specific instances of bad conduct), we think that the trial judge did not err in overruling these grounds of the motion for a new trial. The testimony, if it could be admitted on another trial, could serve no other purpose than that of impeaching the witness Mrs. McNiece; and the rule is well settled that a new trial will not be granted upon testimony merely impeaching in its character.

11. The twenty-third ground of the amended motion is also based upon alleged newly discovered evidence. It appears from the contents of the affidavits as to the newly discovered facts that about five years ago the deceased endeavored to have improper relations with a young girl who is now married and a resident of South Carolina. It does not appear that the deceased succeeded in accomplishing the desires attributed to him. This ground of the motion was properly overruled, because in no view of the case would the newly discovered evidence be admissible upon a trial of the case. It would be wholly irrelevant to the issue as to whether Coart was justifiable in killing McNiece, either in self-defense or in defense of his wife or in defense of the purity of his home.

12. We have not ruled upon the fifth and sixth grounds of the amended motion, because no reference whatever is made to them in the several briefs filed by the plaintiff in error, though all of the other grounds of the motion, even those not argued, are insisted upon.                    *Judgment affirmed. All the Justices concur.*

BECK, P. J., and ATKINSON, HILL, and HINES, JJ., specially concur.